UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES </br></br> v. </br></br> JEROME LASSITER | No. 04-10114-DPW |

### SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE

**I      INTRODUCTION**

The defendant, Jerome Lassiter, intends to change his plea in the above-named case. However, the defendant renews his motion to continue the Rule 11/Sentencing hearing in this case from April 28, 2005, to September 2005, in order to allow him to finish his in-patient treatment at the Ryan House, in Lynn, Massachusetts. The patient began his treatment, which is a four to six month program, in early March. In the alternative, if this Court takes his plea on April 28, the defendant asks that the Court take the plea under advisement, and delay accepting it until the defendant's treatment is completed.[1]

When the Court does accept the defendant's new plea and proceeds to sentencing, it must pronounce a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. 18 U.S.C. § 3553(a). The sentence the government seeks and the U.S.

---

[1] When a court accepts a guilty plea to federal drug charges, the court is required to detain the defendant, or in this case, return the defendant, to the U.S. Marshal's custody. Counsel for the defendant intends to argue for a continuation of this proceeding, in order for the defendant to properly finish his in-patient drug treatment which this Court specifically noted was "not to be a short, i.e., 30 day program." *See* docket entry, 3/03/2005 (Magistrate Judge Alexander's order). The Bureau of Prisons and its correctional facilities will still be operational in September, and the government's demand that the defendant be sentenced now and not a few months from now, following completion of his treatment, is not in the interests of justice.

Probation Office recommends is based exclusively on the now-advisory U.S. Sentencing Guidelines. The sentence sought is greater than necessary because it:

1. Ignores the defendant's drug addiction, which is directly relevant to the charged counts;

2. Contains sentencing enhancements which are dependent upon facts not found by a jury beyond a reasonable doubt;

3. Is based on the weight of crack cocaine, as opposed to powder cocaine, a formula which produces a draconian sentence which even the U.S. Sentencing Commission has recognized as a disparity between black and white defendants; and

4. Is enhanced by a criminal history that is a direct result of drug addiction.

The defendant asks the Court to use its discretion when considering issues which would enhance his sentence, and to take into account relevant factors, such as his current drug treatment, which could reduce the chance of recidivism. The defendant also asks the Court to disregard irrelevant factors, such as the extent of the government's investigation and prosecution of other individuals not related to this case. Such information was provided to the Court, unfairly, and serves no purpose other than possibly to give the Court the incorrect impression that the defendant shares culpability with these other individuals and therefore is unworthy of any sentencing leniency.

**II   ARGUMENT**

The sentencing guidelines are advisory, not mandatory. *See United States v. Booker*, 125 S. Ct. 738 (2005). Although sentencing courts consult the guidelines in an advisory capacity, the

court has discretion to consider other factors, including some which may have been previously discouraged or prohibited, in order to pass judgement appropriate to the defendant. *Id.*; 18 U.S.C. 3553 (a)(Supp. 2004). The mechanical use of the guidelines to set mandatory base offense levels and include enhancements not proven to a jury beyond a reasonable doubt is not permissible. *See Booker,* 125 S. Ct. 738.

1.    Contrary to the government's assertion, the defendant did suggest early in this case that he had a drug dependency.[2] The defendant reported facts indicating his addiction to this Court at his first detention hearing, which the AUSA representing the government in this case attended. *See* Order of Detention, June 30, 2004, at 6 (in which the Court notes the defendant's admission to chronic marijuana use).[3] This issue was also discussed throughout the summer of 2004 between counsel and the defendant's Pre-Trial Services officer, who expressed opposition to any release of the defendant for treatment. As the government notes, the defendant

---

[2] In fact, as early as 2001, during a plea hearing in Roxbury District Court, Roxbury, Massachusetts, the defendant's lawyer at that proceeding told the court that the defendant had admitted to a longtime drug dependency and wanted help. He did not get it then from the Commonwealth of Massachusetts, and now stands charged with another drug offense which is far more evident of a use problem than it is of a wide-scale trafficking business.

[3] The government has insinuated that the defendant's counsel initially took a position against the defendant's treatment: "Nor, does it seem, that Lassiter's own counsel believed last Spring that Lassiter's own report of daily marijuana use was enough to justify release to a treatment facility... [at the May 5, 2004 detention hearing] Magistrate Judge Alexander inquired if Lassiter had any 'substance abuse problems' and defense counsel replied that he was not prepared to address that issue at that time." Government's Opposition To Motion To Modify Conditions, at 5. Counsel was not prepared at the time precisely because he had no medical evidence from a qualified physician or counselor to present to the Court in order to properly rebut the opposition of both the AUSA and the Pre-Trial Services officer. When it was clear to counsel that the defendant was not going to receive the medical evaluation he repeatedly requested at the Plymouth County Correctional Facility, counsel filed its motion without the medical information, and asked the Court for help in seeking the evaluation.

3

told Pre-Trial Services that he "used marijuana every day since he was 12 years of age." Government's Opposition To Motion To Modify Conditions, at 4-5. Neither Pre-Trial Services nor the government considered the statement a sign of addiction. *See id*, at 5.

Counsel moved for the Court to revisit this issue on November 11, 2004. The Court agreed to do so, two months later. On January 10, 2005, the Court ordered Pre-Trial Services to conduct a professional evaluation to determine the defendant's dependency level. Nearly two months after that, the Court reviewed the completed evaluation, an AdCare Report that was prepared by health care professionals that confirmed the defendant required treatment. On March 3, 2005, the Court order release of the defendant for drug treatment purposes. The defendant did not ask for this help in lieu of incarceration. He understands perfectly that the time he is spending in treatment at the Ryan House does not count toward any incarceration time he may receive in this case.[4]

On the other hand, this court has the discretion at sentencing to consider the effects of the defendant's drug dependency. Under the mandatory guideline system, a defendant's drug dependence or abuse was "not a reason for imposing a sentence below the guidelines. Substance abuse is highly correlated to an increased propensity to commit crime." U.S.S.G. § 5H1.4. Ironically, that policy statement expresses exactly why treatment for some offenders should at least go hand-in-hand with incarceration: to reduce recidivism. The defendant's case is typical of low-level street dealers: he sold drugs so that he could have the money to buy drugs for personal use.

---

[4] Rehabilitation is a viable approach to long-term crime control and recidivism reduction, and should be encouraged. No interest of justice will be served by sentencing the defendant, a non-violent offender, before he completes his treatment at the Ryan House.

Like many accused street level dealers, the defendant suffers from his own drug addiction. His is not the resume of a drug kingpin but of someone whose habitual use of drugs has clouded his judgment and procured his ability to lead a law-abiding life. Whatever the eventual sentence, the Court should allow the defendant to finish his current treatment before entering prison, where he will be incarcerated with other convicted drug dealers and addicts. The Court should also recommend, as part of any sentence, the drug treatment program offered by the Bureau of Prisons.

2.     In his objections to the PSR, filed with this Court on January 24, 2005, the defendant stated he was not involved in a conspiracy with his named co-defendant Antonio Cardona. In summary, Cardona saw the defendant and the undercover agent walking along the street, apparently recognized that a drug buy was about to take place, followed them, and entered with them into a liquor store. *See* Revised PSR, ¶ 13. After the defendant sold all the crack cocaine had, the undercover agent asked for more. *Id.*, ¶ 14. The defendant said, "Here we go, he needs three more." *Id*. Cardona led the agent out of the store, without the defendant, and told him to wait across the street while Cardona went to retrieve some of his own supply for sale. *Id*. The government has charged the defendant with the weight Cardona eventually sold that day to the agent.[5] The revised PSR, in response to the defendant's objections, adopts the government's argument, contending that the lack of discussion between the defendant and Cardona regarding further sales to the undercover agent "indicates that they were working jointly." Revised PSR, at 39.

---

[5] None of the weight charged in this case has been proven beyond a reasonable doubt. *See* section 3, *infra*, regarding crack cocaine weight and the 100-to-1 effect it has on sentencing guideline ranges.

The Indictment charges the defendant with both conspiracy and aiding and abetting. The defendant will plead guilty to the facts in the case, as summarized above, and will ask the Court to use its discretion as to whether those facts that Lassiter aided and abetted the sale by Cardona.[6]

3.      Under the sentencing guidelines, which assigns higher offense levels for higher drug quantities, it would take 100 times as much powder cocaine to reach the same offense levels as those assigned to crack cocaine. *See generally* Drug Quantity Table, U.S.S.C. § 2D1.1. The U.S. Sentencing Commission has previously noted the sentencing disparity between crack cocaine and powder cocaine as one which falls heaviest on African-American defendants. *See Fifteen Years of Guidelines Sentencing*, United States Sentencing Commission, Nov. 2004. Eighty-one percent of most crack cocaine offenders are African Americans. *See id.,* at 131. In 2002, the average guidelines sentence for crack cocaine, whether selling or possessing, was 119 months, compared to 78 months for powder cocaine, 94 months for methamphetamines, and 38 months for heroin. *See id*.

As the Commission explained, converting powder cocaine into crack form takes a kitchen stove and baking soda. *See id.* This conversion takes place at the "lowest level of the drug distribution system." *Id.* This is why "[m]ost crack cocaine offenders receiving sentences greater than five years are low-level street dealers. For no other drug are such harsh penalties imposed on such low-level offenders. High penalties for relatively small amounts of crack cocaine appear to be misdirecting federal law enforcement resources away from serious

---

[6] On information and belief, this is the procedure the Court employed when Cardona entered a guilty plea.

traffickers and kingpins toward street-level retail dealers." *Id*.

Further, the Commission's studies have continuously found no justification for the disparity in the guidelines because of any addictive quality unique to crack cocaine:

> The increased addictiveness of crack cocaine is due to its method of use (smoking), rather than to any pharmacological difference between the various forms of cocaine. Powder cocaine that is smoked is equally as additive as crack cocaine, and powder cocaine that is injected is more harmful and more additive than crack cocaine, although cocaine injection is relatively rare.

*Id*. In the case at bar, the defendant would be at offense level 18 for the weight charged solely against him, and at level 20 if the weight charged to Cardona were to be added to the defendant's total. *See* Revised PSR, ¶ 34. The adjusted offense level of 22 includes a two-level enhancement for a playground zone violation. *Id*. On the other hand, the defendant would be facing an offense level 14 for the same amount of powder cocaine, (12 for the powder quantity and two for the playground enhancement) whether Cardona's weight was added or not. Even under criminal history VI, the defendant's offense total would be 37-46 months without reduction for acceptance of responsibility, and 27-33 months with that reduction.

4.     The defendant previously objected to use of his criminal history, on grounds that it overstated the seriousness of his past convictions. See Revised PSR, at 41. The recent Supreme Court decision *United States v. Shepard*, 125 S. Ct. 1254 (2005), held that, at least in some cases, a court cannot make certain factual findings into a defendant's criminal history, such as review of police reports and other information outside of the charging document and what is admitted to during a Rule 11 process. In the defendant's case, the Court has been supplied with police report summaries through the PSR. The defendant objects to the use of these reports, pursuant to *Shepard*.

The government seeks to use the defendant's criminal history to enhance his sentence. The PSR calculates the defendant's Criminal History Category as VI, resulting in a guideline range of 63-78 months for offense level 19. Revised PSR, ¶¶ 54, 93. Without that criminal history, which has not been proven beyond a reasonable doubt, the defendant would be sentenced under Criminal History Category I. The guideline range for offense level 19 under that category is 30-37 months. That range, if afforded to the defendant, would be more in line with the sentence given to Cardona, with whom the government insists the defendant conspired. Cardona's sentence may have reflected a lesser criminal history,[7] but the offense conduct in the case at bar was similar, and Cardona presented no evidence that he himself was drug addicted and was selling primarily to feed his own habit. Even without a reduction for acceptance of responsibility, which would leave the defendant at offense level 22, the resulting guideline range under Category I would be 41-51 months.

5.  The defendant renews his objection to the PSR section listing several other defendants arrested by state and federal law enforcement agents in the Warren Gardens complex, and asks the Court to strike this information from the PSR and not consider it. Such information is surplusage and has absolutely no bearing on the defendant. The Probation Office insisted on keeping this information in the revised PSR, over the defendant's objection, and justified the inclusion by stating that the defendant's "arrest and subsequent Indictment did not happen in a vacuum, it happened in the context of a larger investigation..." Revised PSR, at 37.

---

[7] Cardona was also charged in the Indictment with use of a juvenile to commit a crime, a two-level enhancement under U.S.S.G. § 3B1.4. The government dropped that charge in its plea agreement. Otherwise, Cardona's sentencing range under the guidelines would have been 37-46 months.

This information was provided to the Court to make the defendant appear more culpable than he is. In fact, at the government's behest, the revised PSR contains even *more* information about other defendants arrested in the Warren Gardens complex. The government provided the additional information as "objections" to the original PSR: "Since you seem to be listing the related cases in sequence according to their docket number, there are two other related cases which should be listed...." Revised PSR, at 33.

This information should *not* be included, as it is *not* related to the defendant and is highly and unfairly prejudicial. No criminal investigation occurs "in a vacuum," yet there are limits as to what is relevant at a sentencing procedure. The names and charges against other individuals arrested in the same housing complex has no more bearing on this defendant's case than would a listing of Warren Gardens residents cited for traffic violations during the same time period. The information must be completely disregarded by the Court, especially in light of *Booker* and *Shepard*, cited *infra*.

### III    CONCLUSION

The defendant's current treatment for drug addiction promises to yield long-term personal and societal benefits. As the AdCare Report states: "In the interest of the people, Mr. Lassiter clean, sober, and not involved in criminal activity is the best outcome for all." AdCare Report, at 2. He should be allowed to continue with that treatment. If not, and this Court determines that it should proceed to a Rule 11/sentencing hearing, the defendant asks the Court to exercise appropriate discretion, for the foregoing reasons, and sentence him to a term below the advisory range recommended by the government.

                JEROME LASSITER
                By his attorney,

/s/ *John H. Cunha Jr.*
John H. Cunha Jr.
B.B.O. No. 108580
CUNHA & HOLCOMB, P.C.
One State Street, Suite 500
Boston, MA 02109-3507
617-523-4300

Dated: April 27, 2005                                                   H:\Word\Crim\Lassiter\Motion for downward departure.wpd