```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     )
                             )
          v.                 )    CRIMINAL NO.   04-10114-DPW
                             )
2.   JEROME LASSITER,        )
     a/k/a "BUTTA,"          )
                             )
          Defendants.        )
```

## GOVERNMENT'S SENTENCING MEMORANDUM AND OPPOSITION TO DEFENDANT JEROME LASSITER'S MOTION FOR A DOWNWARD DEPARTURE

Now comes the United States of America, by and through the undersigned counsel, and submits herewith the Government's Sentencing Memorandum and Opposition to Defendant Jerome Lassiter's Motion for a Downward Departure. For the reasons more fully set forth below, the government submits that a sentence within the Guidelines Sentencing Range ("GSR") applicable to Jerome Lassiter ("Lassiter") (63-78 months) is a reasonable sentence and recommends that Lassiter be sentenced to incarceration for a period of 70 (seventy) months; to a term of supervised release for six (6) years, including a special condition that he stay away from the Warren Gardens housing development and Copeland Street areas in the Roxbury section of Boston; no fine, since it appears that he is indigent; and a $300 special assessment.

1. **The GSR Applicable to Lassiter (18 U.S.C. §3553(a)(4)-(5):**

In United States v. Booker, 125 S.Ct. 738, 767 (2005), the Supreme Court made the U.S. Sentencing Guidelines ("the Guidelines"

or "the USSG") advisory but also made it clear that district courts "must consult those Guidelines and take them into account when sentencing" (citing 18 U.S.C. §3553(a)(4), (5)). While Section 3553(a) identifies other sentencing factors as well, the government submits that, in arriving at an appropriate and "reasonable" sentence for any particular defendant, it makes sense to start with an analysis and understanding of the sentence recommended under the Guidelines. This is so for several reasons.

First, a sentence within the applicable GSR reflects the federal courts' collective sentencing expertise accumulated over the past two decades and therefore should carry considerable weight with any sentencing court. Second, the Sentencing Commission designed the Guidelines, and the sentences prescribed thereunder, to reflect many of the other sentencing considerations enumerated in 18 U.S.C. §3553(a), such as the seriousness of the offense, at least certain offender characteristics, the need to promote respect for the law, to afford adequate specific and general deterrence, and to ensure that defendants who deal drugs receive similar sentences. See 18 U.S.C. §§3553(a)(1)-(4), (6). Thirdly, the Guidelines provide a well-considered, time-tested, systematic and orderly framework within which to evaluate most, if not all, of the factors pertinent to any sentencing decision.

    **(a)** **Lassiter's Offense Conduct:**

Lassiter stands convicted of distributing drugs on June 19 and

July 1, 2003, and the facts to which he admitted at his change-of-plea hearing readily support his conviction for aiding and abetting and/or conspiring with Antonio Cardona to distribute an additional quantity of drugs on June 19, 2003.[1]  The drugs in question were crack cocaine, a highly addictive and dangerous drug, and totaled 2.4 grams.[2]  Not only did Lassiter distribute his drugs in the

---

[1] In his Supplemental Sentencing Memorandum ("Suppl. Sent. Mem."), at 2 n.2, Lassiter requests that the Court "consider as a matter of law if the defendant's conduct rose to the level of conspiracy and aiding and abetting."  As Lassiter correctly suggests, his co-defendant, Antonio Cardona ("Cardona"), admitted the same facts as Lassiter (the description of their offense conduct, including but not limited to paras. 12-17, is identical in their presentence reports ("PSRs")) and left it up to the Court to determine if those facts were sufficient to make out a case of conspiracy or aiding and abetting.  To the best of the government's recollection, the Court commented to the effect that it could hardly conceive how the facts admitted by Cardona would not be sufficient to support a conviction for conspiracy and/or aiding and abetting.  For obvious reasons, the government submits that the same analysis applies to Lassiter.  Indeed, the analysis is even more applicable to Lassiter than it was to Cardona, since Lassiter clearly, at the very least, aids and abets Cardona's drug distribution by referring the undercover officer to Cardona when the undercover officer requested more crack cocaine than Lassiter had on his person (PSR para. 14)(whereas it is less clear how Cardona aided and abetted Lassiter's earlier distribution of crack to the undercover officer).

[2] In his Sentencing Memorandum and Motion for Downward Departure ("Sent. Mem."), at 5 n.5, Lassiter asserted that "[n]one of the weight charged in this case has been proven beyond a reasonable doubt."  That pleading was prepared and filed before Lassiter entered his change of plea (and at a time when it was still possible that Lassiter would be sentenced immediately after entering a guilty plea).  Consequently, it does not reflect that, at his Rule 11 hearing, Lassiter admitted the weight of the crack cocaine as reflected in his pre-plea PSR (at paras. 17 and 20), while continuing to deny legal liability for the 0.57 grams distributed by Cardona on June 19.  See, e.g., Suppl. Sent. Mem. at 2 n. 2, wherein Lassiter now seems only to contest whether the

3

Warren Gardens area, where the incidence of drug trafficking and associated crimes of violence was so out of control that it had been designated as a "hot spot" (PSR at para. 2), but he did so in a playground zone.[3] The first of these sales occurred just a few months after his release from a House of Corrections sentence **for possession with intent to distribute crack cocaine in the very same area!**

---

0.57 grams sold on June 19 by Cardona should be attributed to him.

    [3] It is the government's understanding that Lassiter no longer stands by his objection to the playground zone violation (see Objection #5 to PSR at p. 40 of PSR) because he admits that he delivered drugs to the undercover officer on June 19, 2003 inside Garden Liquors (not Warren Liquors) and that that location is within 1,000 of the Little Scobie Playground on Copeland Street.

(b) **Lassiter's Criminal History:**[4]

A review of Lassiter's criminal history shows an escalating level of severity, that Lassiter has abused every break he was ever given, that he has been given all the breaks he should get and that the community needs to be protected from him by his incarceration for a substantial period of time.

Lassiter was arrested on July 17, 2001 for knowingly receiving a stolen motor vehicle and appeared in court on August 21, 2001. PSR para. 43.  A mere 25 days later, on September 15, 2001, Lassiter was arrested again in possession of a stolen motor vehicle and found to be in possession of crack cocaine and marijuana.  PSR

---

[4] Lassiter observes that his criminal history "has not been proven beyond a reasonable doubt" and argues that the consideration of any information contained in police reports violates the rule announced in United States v. Shepard, 125 S.Ct. 1254 (2005).  However, as the First Circuit recently ruled in United States v. Serrano-Beauvaix, a defendant's criminal history as documented in the PSR satisfies the government's "modest burden" to establish the existence of the defendant's prior convictions and, thereafter, the burden shifts to the defendant to show that an earlier conviction was constitutionally infirm or otherwise inappropriate for consideration.  400 F.3d 50, 54 (1st Cir. 2005)(internal quotations and citations omitted), petitions for cert. filed, (May 27 and June 2, 2005)(Nos. 04-10405 and 04-10489).  As for Shepard, that Supreme Court decision required that a sentencing court consider only charging documents or admissions made by a defendant in connection with a prior conviction, and not underlying police reports, to determine if that prior conviction qualified as a predicate for a statutorily enhanced federal sentence.  125 S.Ct. at 1257.  Lassiter has pointed to nothing, and there is nothing, in the Shepard decision which precludes a sentencing court from considering underlying police reports to evaluate the severity of a defendant's prior criminal history, especially where a defendant has placed that history at issue.

para. 44.  He appeared in court on these new charges on September 17, 2001.  The very next day, officers from the Boston Police unit (the Youth Violence Strike Force ("the YVSF")) which participated in the investigation underlying the instant federal charges, and who were already familiar with Lassiter, were patrolling the Warren Gardens area when they found Lassiter in possession of crack cocaine and $180 in cash.  PSR para. 45.  He appeared in court on this third set of adult charges, including possession with intent to distribute a Class B controlled substance, and, on October 18, 2001, he plead guilty to the reduced charge of possession of a Class B controlled substance and was sentenced to probation for one year.

   Whereas Lassiter would have the Court believe that his criminal history overstates his criminality, the government submits that, if anything, his criminal history <u>understates</u> his true criminality.  The two preceding possessory drug convictions illustrate the point well.  Lassiter's instant convictions establish that he carried small amounts of crack cocaine on his person (including in his mouth) for distribution in the Warren Gardens area.  While Lassiter has acknowledged using other drugs with some regularity, he describes himself only as having "experimented with crack. . . ."  PSR para. 81.  Therefore, the government submits that it is more likely than not that the crack cocaine with which Lassiter was caught on September 17 and 19, 2001

was, in fact, intended by him for distribution.

Less than two weeks after pleading guilty to a reduced possessory charge, on October 31, 2001, Lassiter again was caught with crack cocaine on his person, this time at South Boston High School, and appeared in court that same day. PSR para. 46. Just two weeks later, on November 14, 2001, YVSF officers again find Lassiter in the Warren Gardens area holding a marijuana cigarette and an additional quantity of marijuana within 1,000 of a school. PSR para. 47. Lassiter appeared in court the next day. Id. On November 29, 2001, Lassiter pled guilty to and was sentenced to probation for one year on the October 31 crack cocaine possessory offense. PSR para. 46. Less than two weeks later, on December 11, 2001, Lassiter resolved many of his outstanding charges:

> he pled guilty to and was sentenced to approximately 27 months' probation (until March 8, 2004) on his August 21 and September 17 offenses (PSR paras. 43-44);
>
> his probationary sentence for his September 19 Class B possessory conviction was violated and he was sentenced to serve a 6-month sentence (PSR para. 45); and
>
> he pled guilty to and was given a 3-month consecutive sentence for the marijuana offense in Warren Gardens (PSR para. 46).

Even though Lassiter was sentenced to serve 9 months on December 11, 2001, he was arrested again approximately 7 months later, on June 16, 2002, when officers from the YVSF again found him in the Warren Gardens area with crack cocaine on his person -- this time in his mouth. PSR para. 48. This time Lassiter pled

7

guilty to possession with intent to distribute the crack cocaine and, on July 17, 2002, was sentenced to serve another 9 months. Id.  His one-year probationary sentence on his August 21 and September 17, 2001 convictions also was revoked and he was sentenced to a concurrent 9 months on those convictions and, two months later, his one-year probationary sentence for his September 19, 2001 possessory offense was revoked and he was sentenced to serve a concurrent 6 months.  PSR paras. 43-45.

Lassiter was released from custody on February 15, 2003 and, less than one month later, on March 9, 2003, he was arrested in possession of a firearm (an offense to which he would plead guilty a year later) under circumstances suggesting that he might have used it to shoot someone.  PSR paras. 48-49.  The record does not reflect if Lassiter was detained for any period of time after this arrest, but he was again in the Warren Gardens area on June 19, 2003 when he committed the first of the crack cocaine distributions to which he has pled guilty before this Court.  PSR paras. 12-15. On that occasion, he had crack on his person when he serendipitously ran into an undercover officer posing as a buyer and, when Lassiter again encountered the same undercover officer serendipitously less than two weeks later, Lassiter not only was again ready, "Johnny-on-the-spot," to sell the undercover officer three bags of crack cocaine which he was carrying in his mouth, but he also had relatively close at hand within the Warren Gardens

development a concealed stash containing still more crack cocaine. PSR paras. 18-20.

Of course, Lassiter was not arrested immediately after selling crack cocaine to the undercover officer because the investigation was intended to address in a more systematic and comprehensive way the high incidence of drug-trafficking and of associated crimes of violence which had caused the Warren Gardens area to be designated a "hot spot."[5] Consequently, Lassiter was still at liberty when he was again charged on January 24, 2004 with knowingly receiving another stolen motor vehicle. PSR para. 50. In the space of just two and one half years (August 21, 2001 to January 26, 2004) and before he had reached his twentieth birthday, Lassiter managed to rack up a total of 17 criminal history points, -- four more than the amount needed to place him in the highest Criminal History Category, CHC VI.

Lassiter's criminal history prompted Magistrate Judge Alexander to describe him as follows:

> Despite his youth, he has been prodigious in criminal conduct. His record as an adult reveals that he has "graduated" from early insurance and motor vehicle

---

[5] Lassiter objects to the inclusion in his PSR of information relating to the larger Warren Gardens investigation and to the other federal defendants facing charges arising out of that investigation. However, as the Probation Officer points out in responding to this objection, it is entirely appropriate for the government and the Probation Office to disclose to the Court the fact that the charges against Lassiter and his co-defendant arose out of a larger investigation and for the Court to consider the sentences imposed in related cases.

>   violations, to convictions for knowingly receiving stolen property, operating a motor vehicle after suspension of his driving license to, in a rather short time span, various and repeated controlled substance offenses and at least one firearms violation (for which he was on supervised release at the time of this offense).
>
>   As alarming to this Court is the fact that his record indicates repeated defaults while on probation; not surprisingly, his supervised release was revoked. The Court directed the P[re-Trial]S[ervices]O[fficer] to inquire of the status of Mr. Lassiter with his Massachusetts probation officer. That inquiry yielded information that is also significant: notwithstanding a more recent understanding of the need to obey the law (an epiphany purportedly coinciding with the birth of the defendant's child), Mr. Lassiter evidently missed every scheduled drug test ordered by the Massachusetts court (some, but not all, of those absences were due to the defendant's incarceration), for failing to report and for not having verification of his residence.

Order on Detention at 6 (footnotes omitted).

There is absolutely no evidence in the record before this Court that Lassiter's criminal record was fueled by a physical addiction to drugs of any kind or that he committed his crimes only to support a drug habit. While Lassiter has self-reported steady abuse of marijuana from an early age (PSR paras. 78-81), he has had two periods of enforced abstinence (the time served on a 9-month sentence imposed on December 11, 2001 and the time served on a 9-month sentence imposed on July 17, 2002) in the 19 months preceding the first of his federal offenses. Indeed, in the course of his evaluation by ADCARE earlier this year, Lassiter reported that "[h]e served 6 months in 2003 [sic] at the South Bay House of Correction for violation of probation. He reports he was in the

Drug Rehabilitation Unit, where he became clean and abstinent, and went to AA. . . ." See first attachment to April 27, 2005 letter to the Court by Pre-Trial Services Drug/Alcohol Treatment Specialist Judith Oxford.  Moreover, the government submits that the relative ease with which Lassiter remained apparently drug-free during four months of residential drug treatment suggests that, while Lassiter may have been a frequent drug abuser, he suffers from no drug dependence.[6]

Lassiter's record in recent years is one of unremitting and escalating criminality notwithstanding increased law enforcement attention and numerous second chances.  It points strongly to the need to incapacitate and deter Lassiter and to protect the community from him with a significant prison term. 18 U.S.C. §3553(a)(2)(C) ("the need for the sentence imposed -- to protect the public from further crimes of the defendant").

2. **The need for imposition of a Guidelines sentence (18 U.S.C. §3553(a)(2):**

The government submits that the imposition of a Guidelines sentence in this case is needed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just

---

[6] The reports submitted to the Court by Judith Oxford, Pre-Trial Services Drug/Alcohol Treatment Specialist, and the accompanying reports from the Ryan House, strongly suggest that Lassiter's primary interest in getting released to a drug treatment program was in maximizing the unstructured time he could spend with his now nine-month old son and his girlfriend(s).

punishment for the offense," as well as "to afford adequate deterrence to criminal conduct. . . ." 18 U.S.C. §3553(a)(2)(A)-(B). This is true in part because crack cocaine is a particularly pernicious drug and because this defendant has ignored every warning shot previously afforded him by the criminal justice system. A substantial sentence also is needed in this case in light of the widespread drug-trafficking and associated crimes which have plagued the Warren Gardens area and which are described in the PSR, at paras. 2-11. Just as Lassiter was motivated to seek release to a drug treatment program when he learned that Corey Smith and Carlos Barrientos, Warren Gardens defendants in other cases pending in this court, had been released to such programs, so the Warren Gardens defendants and their associates are keenly aware of the sentences that have been and will be meted out in the eight federal cases arising out of the Warren Gardens investigation.

    3.    **Lassiter's need for vocational training (18 U.S.C. §3553(a)(2)(D)**:

Lassiter, at best, has enjoyed only a passing acquaintance with legitimate employment (PSR paras. 84-88 and June 30, 2005 memorandum to the Court from Judith Oxford, at 2) and reports having no particular job skills (PSR para. 83). It is likely, therefore, that a substantial prison sentence will allow Lassiter to avail himself of vocational training programs available in the federal prison system. Lassiter reports having obtained his GED while previously incarcerated, but the Massachusetts Department of

Education has no record of Lassiter being awarded a GED. PSR para. 82. If, in fact, Lassiter is mistaken and has not obtained his GED, this is another worthwhile objective which could be accomodated by a substantial sentence. Finally, if Lassiter truly needs or could benefit from a substance abuse treatment program, that is yet another programmatic objective which could be fulfilled during the course of a substantial sentence (and, as Lassiter is no doubt aware, could result in a reduction in the amount of time he actually has to serve).

    4.    **<u>Application of the crack cocaine guidelines</u>:**

Lassiter urges this Court to consider the disparity in sentencing for crimes involving crack cocaine compared to those involving cocaine powder -- a factor which is not cognizable under the Sentencing Guidelines and which, therefore, can only be viewed as a basis for "deviating" from the Guidelines (as distinguished from <u>departing</u> pursuant to the Guidelines from the otherwise applicable GSR). The government submits that Lassiter's argument, at best, identifies an issue for consideration by policy makers, not jurists sworn to enforce the laws which exist.

No court of appeals has found the disparity in punishment applicable to crack cocaine versus cocaine powder to be unconstitutional. See <u>United States v. Singleterry</u>, 29 F.3d 733, 739-741 (1st Cir. 1994) ("the district court correctly concluded that 'Congress had before it sufficient . . . information to make

distinctions that would justify . . . more severe sentences for trafficking in or using cocaine base or crack than cocaine itself'")(citation omitted); and United States v. Graciani, 61 F.3d 70, 74-75 (1st Cir. 1995)("We have squarely rejected claims that the conversion formula [equating one kilogram of crack cocaine to one hundred kilograms of powdered cocaine for sentencing purposes] has a greater impact on African-Americans, and, thus, transgresses the Equal Protection Clause of the Fifth Amendment")(citations omitted).

In the post-Booker context, it also is important to keep in mind that the disparity in sentencing for crack cocaine compared to cocaine is not a creation of the Sentencing Guidelines, but is dictated by statute. Compare, e.g., 21 U.S.C. § 841(b)(1)(A)(ii) with 21 U.S.C. § 841(b)(1)(A)(iii); and see United States v. Eirby, 262 F.3d 31, 40-41 (1st Cir. 2001) ("The statutes criminalizing drug trafficking and the ancillary sentencing guidelines admittedly attach much harsher penalties to the distribution of cocaine base than to the distribution of like quantities of powdered cocaine")(citations omitted).

Perhaps the best rationale for applying the crack cocaine guidelines even in the wake of Booker was offered by Judge Richard G. Kopf, a longtime and outspoken critic of those guidelines, in United States v. David Tabor, 365 F.Supp.2d 1052 (D.Neb. 2005). Even though Judge Kopf disagreed deeply with the crack cocaine

guidelines and was haunted by the memory of "a sad, black crack addict who, using her socks, hung herself in the holding cell adjacent to [the Judge's] courtroom shortly after a jury over which [the Judge] was presiding found her guilty of crack cocaine trafficking," 365 F.Supp.2d at 1058 (citation omitted), he recognized "a fundamental truth about crack":

> [that] crack cocaine frequently possesses and destroys the poorest and most vulnerable among us. It is for that reason -- Congress' evident desire to protect those who are least able to protect themselves -- that a judge ought not play legislator and should instead give the crack Guidelines substantial or heavy weight after <u>Booker</u>. It is that simple. <u>Booker</u>, 125 S.Ct. at 768 (consistent with the Constitution, Congress may pick the "sentencing system" that it "judges best").

365 F.Supp.2d at 1058. Judge Kopf observed that, "unlike Congress or the [Sentencing] Commission, we judges lack the institutional capacity (and, frankly, the personal competence) to set and then enforce one new, well-chosen, theoretically coherent, national standard" and warned that, "[a]s opposed to a uniform, albeit flawed, Guideline, it would make things far worse to have a bunch of different standards for crack sentencing." 365 F.Supp.2d at 1061. Judge Kopf concluded:

> Congress has made a choice regarding crack cocaine. To my way of thinking, it is not the best choice, but it is not a crazy one either. As a judge, I should defer to the choice of penalties that Congress has made for crack cocaine even though I would quickly do something different if it were within my proper role to choose. This is because judge-made changes to the crack Guidelines, while sometimes principled, are (1) undemocratic, and (2) not plainly superior to the judgments of Congress. . . . When it comes to the

severity of punishment, Congress has the right to be wrong.

365 F.Supp.2d at 1060.

Finally, the government notes that deviating from a Guidelines sentence for Lassiter based on the crack cocaine-powder cocaine disparity would promote a disparity in sentencing between defendants, thereby defeating one of the statutory purposes of sentencing.  18 U.S.C. §3553(a)(6)("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").  It would trigger disparity in sentencing within the context of this two-defendant prosecution, since this Court already imposed on Lassiter's co-defendant, Cardona, a sentence which was computed based on the offense level attributable to crack cocaine and which the parties agreed was reasaonable.  It also would trigger disparity in sentencing among the various Warren Gardens defendants who are facing federal charges arising out of the same investigation.  For instance, defendants Jermaine Anderson, Corey Smith and Alfred Ryan were sentenced by Judge Lasker, who rejected all appeals to disregard the Guidelines for crack cocaine offenses as compared to those for powder cocaine(but who deviated from the Guidelines on other grounds).[7]  PSR para. M.  Last, but not least, as Judge Kopf has

---

[7] The government has sought authorization from the Justice Department to appeal the 46-month sentence imposed on Corey Smith.

16

cautioned, disparate sentences nationwide would result if every jurist critical of the Guidelines applicable to crack cocaine were to substitute his or her own set of sentencing "guidelines" for this category of offenses.

## **CONCLUSION**

The government perceives Lassiter as a serious criminal recidivist whose criminal career was significantly escalating in it severity just as he was arrested in April of 2004 for the instant offenses.  The government is particularly troubled by the fact that Lassiter repeatedly abused second chances which he was given by the criminal justice system and that, less than a month after his most recent release from incarceration, he was caught with a firearm. Lassiter has shown little interest in obtaining legitimate employment and may well lack any marketable job skills.  For all these reasons, the government believes that a sentence of 70 months -- at approximately the mid-point within the applicable GSR -- is a reasonable sentence and is necessary to meet all the objectives of sentencing.  Combined with a six-year mandatory minimum period of supervised release, such a sentence will keep Lassiter under the supervision of the federal criminal justice system until his early thirties  -- a reasonable period of time within which Lassiter can turn his life around and during which the community can be

protected from the chances of his returning to a life of crime.

                            Respectfully submitted,

                            MICHAEL J. SULLIVAN
                            United States Attorney

                      By:  *s/Patrick Hamilton/*
                            PATRICK M. HAMILTON
                            Assistant U.S. Attorney
                            U. S. Attorney's Office
                            John Joseph Moakley
                            United States Courthouse
                            1 Courthouse Way, Suite 9200
                            Boston, MA  02210
Date:    July 22, 2005        (617) 748-3251

## CERTIFICATE OF SERVICE

    I, Patrick M. Hamilton, do hereby certify that a copy of the foregoing has been served this date electronically upon John H. Cunha, Jr., Cunha & Holcomb, P.C., One State Street, Suite 500, Boston, MA 02109, counsel of record for defendant Jerome Lassiter.

Date:    July 22, 2005          *s/Patrick Hamilton/*
                                          Patrick M. Hamilton